UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. 20-10039-RWZ |
| v. ) | |
| ) | |
| DAVID M. NANGLE, ) | |
| Defendant. ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

It was September 7, 2016 and Rep. Dave Nangle, the 16-year veteran of the Massachusetts State House, had been whistled down to the Office of Campaign and Political Finance (OCPF) to face the music, again. "Cut the shit. This is not okay," said the OCPF Chair, who by then was well-versed with Nangle's liberal use of the House per diem[1] account. By the OCPF Chair's most recent calculation, Nangle would have had to have driven over 40,000 miles (*in addition to his State House commute from Lowell*) in performing "constituent" services in the two years prior based on the Rep's collecting approximately $8,000 in per diem payments. *See* PSR ¶¶ 19-21.

But Nangle, the former Vice-Chair of the House Ethics Committee, seemed unfazed by the most recent accusation in this latest meeting with OCPF. He defiantly retorted, "If I go to CVS, see someone who needs help, then it's on the job." Satisfied by his own response, Nangle left the OCPF offices and went on his way. With OCPF as the lone voice in state government flagging Nangle's ongoing indiscretions, Nangle felt free to continue pilfering from his campaign account. *See* PSR ¶¶ 23-27.

---

[1]   From 2014-2016, the State Legislature paid per diem rates of approximately $26 per day for miles, meals, lodging and office expenses related to legislators' work. From 2017 forward, the State Legislature ceased paying per diems and paid a lump sum of $15,000 to each legislator for miles, meals, lodging and office expenses.

1

So he did.  Thousands more to pay for his private golf club dues, thousands to pay for his meals and trips to casinos, and at least over a thousand in blatant cash grabs via fake campaign payments to "consultants," who were, in reality, strawmen that cashed the check proceeds and delivered the money to the Rep in cash envelopes.  *See* PSR ¶¶ 14-27.

Fast forward to June 5, 2019 in Nangle's Lowell home to a more uncomfortable meeting.  That night, across his dining table sat two federal agents, one from the FBI and one from the IRS.  The agents had a screenshot from a May 2, 2018 video at the Mohegan Sun casino of Nangle paying a "ten percenter"  cash in order to collect his slot machine winnings tax-free that night.[2]  The agents had evidence of his years of false federal tax returns.  The agents had evidence of Nangle's bank fraud and campaign fund stealing.  But the agents still had questions for the Rep., who sat in nervous silence.  *See* PSR ¶¶ 52, 58.

Why was a Billerica business owner (BBO) paying the State Representative for Lowell $27,000 for "consulting" via a December 2014 check for $10,000 and a February 2015 check for $17,000?  What qualifications did Nangle have as a "consultant"?  And what exactly were these "consulting" services?  The Rep opened his mouth to speak, but only to pose a question to the agents: "Are you guys going to arrest me tonight?"  When the agents responded no, Nangle politely excused them from his home that evening.  *See* PSR ¶ 58.

Flashback to January 6, 2015 at the Statehouse - the very last day of the 188th Legislative Session.  Nangle (DN), standing outside the Senate lobby, texted the BBO triumphantly:

- DN:  We just rounded second base.

---

[2]   A "ten percenter" is someone who collects winnings on a gambler's behalf in exchange for approximately 10 percent of the winnings, thereby allowing the gambler to avoid reporting his winnings on his taxes.  In this case, Nangle paid the "ten percenter" a fee in exchange for that person falsely claiming to have won money at the slots.  This scheme resulted in the casino issuing a Form W-2G in the ten-percenter's name, instead of in Nangle's name, which allowed Nangle to lower his tax liability yet again through fraudulent means.

- BBO: Oh so it's engrossed! Lol How freakin quick a learner am I?
- DN: We just rounded third!!!
- BBO: Enacted?
- DN: Very good. I'm sitting in the senate lobby watching [Senate President] Terry MURRAY getting ready to enact it.
- BBO: Hey- great job man. I appreciate you going out of your way for me. It means a lot. […] told me that […] told him that "he wished he could take some credit for this but it was all Rep Nangle". You are a good friend!

The text messages encapsulated Nangle's successful amendment to Massachusetts House Bill H4553 (*see* House Journal, Jan. 6, 2015; M.G.L., Part I, Title IX, Ch. 64, Sec.6), one of the thousands of unremarkable, uncontroversial, and inscrutable legislative acts that remain largely invisible to the general public. Nangle's amendment, in short, would create millions of dollars in tax credits to developers seeking to develop property in Boston's seaport area. Something of little moment to the ordinary taxpayer, but of extraordinary importance to a developer. One of those prospective developers happened to be the BBO's client. Thus, to the BBO, Nangle's amendment meant currying favor with an important client and the potential for future lucrative contracts. *See* PSR ¶¶ 55-56.

To Nangle, his amendment was simply the quid. So in February 2015, Nangle went to the BBO to collect more of the quo, the $17,000 check. Money that Nangle would use to fool a Lowell Bank into giving him a mortgage for his Lowell home. And on and on the bribery scheme went. Nangle continued to come through with the quid, *i.e.*, shepherding iterations of the tax credit bill through the House from 2015 to 2018, and Nangle continued to ask for and receive the quo, *e.g.*, free stays at the BBO's oceanfront vacation property (which rented at $7,500 per week), thousands

3

of dollars in political donations from the BBO and his associates, and other in-kind benefits.  PSR ¶¶ 56-57.

Flash forward to June 2019, following the federal agents' visit to Nangle's Lowell home.  This time the Rep. knew he couldn't shake off the FBI and the IRS as easily as OCPF.  During their visit, the agents had served Nangle the dreaded "target letter," a letter on government stationery informing Nangle that he was the target of a federal grand jury investigation.  Witnesses were being called to the grand jury, he learned.  Documents were being subpoenaed.  Concerns about his fraud, bribery, and theft from his campaign funds had turned into a full-fledged federal investigation.  Nangle knew what he had to do next.  Nangle went into full damage-control mode.  Federal obstruction.  *See* PSR ¶¶ 52, 58.

Nangle, believing his phone line was tapped, used a mutual friend (MF) to contact the BBO.  "They're looking into the checks," was the message relayed to the BBO.  They needed to come up with an explanation for the checks that did not involve Nangle using his state office.  So the coconspirators concocted a phony, backdated employment contract in which they pretended that the BBO had paid Nangle $27,000 because of purported "real estate" services that Nangle provided to the BBO.  Then, in late June 2019, the two conspirators met secretly inside MF's garage in Lowell as per a prearranged agreement, signed two copies of the phony contract, and went their separate ways.  For a time, the ruse succeeded, the grand jury investigation was stymied, and the truth was put on hold.  *See* PSR ¶¶ 59-60.

This is what public corruption in Massachusetts looks like.  Last minute seaport regulations added by a Rep. representing a landlocked district.  Shady payments and gifts mixed with thousands of dollars in political donations.  And last but not least, concealment, coverups, and a

4

clandestine garage meeting. Nangle may not have invented the classic quid pro quo, but he played his role to perfection. The people of Massachusetts were all worse off for it.

For this persistent and pernicious abuse of power—which provides key insight into not only the "nature and circumstances of the offense," but also the "history and characteristics of the defendant," *see* 18 U.S.C. § 3553(a)(1)—the government requests that, on September 15, 2021, the Court sentence defendant David Nangle to prison for 18 months, a sentence that is within the United States Sentencing Guidelines ("Guidelines") as calculated by the United States Probation Office, and forfeiture of $15,650.50. Given the facts and circumstances of this case, a downward variance from an already-low advisory sentencing guideline range would not "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," or "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).

  I.  <u>Advisory Sentencing Guidelines</u>

The United States Probation Office ("Probation") position with respect to the Sentencing Guidelines is set forth at pages 19-22 of the Final Pre-Sentence Report (PSR ¶¶ 66-92), and follows, in sum:

<u>Count Group 1 (Wire Fraud) – subtotal 15</u>

  (i)  in accordance with USSG § 2B1.1(a)(1), defendant's base offense level is 7 because the offense of conviction has a statutory maximum prison term of 20 years or more;

  (ii)  in accordance with USSG § 2B1.1(b)(1)(C), the defendant's offense level is increased by 4 because the loss is more than $15,000;

  (iii)  in accordance with USSG § 3B1.3, the defendant's offense level is increased by 2 because the defendant abused a position of public trust; and

  (iv)  in accordance with USSG § 3C1.1, the defendant's offense level is increased by 2 because the defendant obstructed the administration of justice.

Count Group 2 (Filing False Tax Returns) – subtotal 14

(i) in accordance with USSG § 2T4.1(D), defendant's base offense level is 12 because the defendant's tax loss is more than $15,000 but not more than $40,000; and

(ii) in accordance with USSG § 3C1.1, the defendant's offense level is increased by 2 because the defendant obstructed the administration of justice.

Multiple Count Adjustment – total 17

(i) in accordance with USSG § 3D1.4, defendant's offense level is increased by 2 from the highest Count Group (Count Group 1) because Count Group 1 and Count Group 2 count as 2 units.

Finally, in accordance with USSG § 3E1.1, the defendant's offense level is decreased by 3 levels because the defendant demonstrated acceptance of responsibility for the offenses and timely notified authorities of his intention to plead guilty.

Accordingly, the total offense level is 14. The defendant's criminal history category is I, which results in a GSR of 15 to 21 months' imprisonment. PSR at ¶ 141.

Neither the government nor the defendant objected to Probation's calculation of the sentencing guidelines in the PSR.

II.   18 U.S.C. § 3553 Factors

An 18-month sentence is appropriate in this case. The gravity of the offense cannot be overstated. In sum, this case revealed that one of the highest positions in state government was for sale. In return for helping Nangle purchase his Lowell home, the BBO was literally able to spoon feed him statutory language that Nangle then cut and pasted into actual state legislation. That a mere $27,000 bribe could move the gears of government to propose a multi-million dollar tax credit for a developer undermines the public's confidence in its essential government institutions and erodes the public's faith in its public stewards. The public is the victim in this case.

An 18-month sentence is also appropriate for this defendant. The defendant was an experienced public official, having spent decades mastering the nuances of Beacon Hill and reaching the highest levels of state government. He had served as the Chair of the House Committee on Ethics, the Chair of the Steering, Policy, and Scheduling Committee, and by 2018 he held a leadership position on the House Speaker's team as a Second Division Chair. But instead of focusing his energy on his constituents, he devised ways to steal money from his campaign donors; he used his stature as the Lowell State Representative (coupled with lies) to obtain favorable loans from a Lowell Bank that would not otherwise have extended the money to such a bad credit risk; he cheated on his taxes; and he sold his public office to private interests in order to line his own pockets with cash.

Nangle then added to his catalogue of misconduct and crime by obstructing justice in a way that had a material impact on this investigation and prevented the full scope of his fraud, corruption, and bribery from being uncovered.[3] The Probation Office correctly applied an obstruction of justice enhancement in calculating Nangle's guideline range, but a two-level enhancement for obstruction does not fully capture the import of Nangle's obstruction. Not only did Nangle frustrate the grand jury's investigation into his litany of crimes, but it provided the umpteenth example of a person in a position of power and trust engaging in criminal conduct that he thought he could get away with. This is not a case where a defendant is appearing before this Court based on an aberrant lapse in judgment that tarnished an otherwise law-abiding career serving the public. Nangle is before this Court because year after year, Nangle repeatedly showed

---

[3] The government is not seeking an upward variance or departure based on the uncharged public corruption uncovered in this case. At the very least, however, the government believes that the uncharged corruption provides a reason to not grant a downward variance in this case. Put differently, the government highlights some of these facts to counter what it anticipates the defense will argue as a reason for a downward variance: that this conduct was somehow an aberration from an otherwise law-abiding life dedicated to public service. The evidence in this case shows that Nangle's crimes were anything but a one-off lapse in judgment.

Case 1:20-cr-10039-RWZ   Document 70   Filed 09/09/21   Page 8 of 9

a lack of judgment and lack of respect for the law, and he routinely engaged in conduct that he knew was in violation of the law. Year after year, he lied on his taxes and committed tax fraud. Month after month, he stole from his campaign account and committed wire fraud. Application after application, he lied to the bank and committed bank fraud. And he then topped it off by obstructing justice when the investigation into his tax and wire fraud started looking into his public corruption and bribery.

A prison sentence in this case is necessary to promote respect for the law and serve as adequate deterrence. Campaign accounts must not be used as petty cash boxes by public officials. Public officials must be held accountable for lying to financial institutions that serve the community. Public officials must pay – honestly and accurately – their share of the tax burden that the rest of society shoulders. And public officials must promote respect for the law, not make a mockery of the law by blatantly obstructing justice, especially when it comes to hiding their own corruption and fraud.

For all the foregoing, the government believes that a sentence of 18 months' imprisonment and forfeiture is sufficient but not greater than necessary to acknowledge the seriousness of the offense, justly punish the defendant, protect the public, and promote respect for the law.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:   /s/ Dustin Chao
      DUSTIN CHAO
      KUNAL PASRICHA
      Assistant U.S. Attorneys

8

**CERTIFICATE OF SERVICE**

      I, Dustin Chao, certify that I caused a copy of this memorandum to be served electronically via ECF on defense counsel and by e-mail to U.S. Probation.

*/s/ Dustin Chao*
DUSTIN CHAO
Assistant U.S. Attorney

Date:   September 9, 2021